RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

SHEILA ARMSTRONG,

       *Plaintiff-Appellant*,

    *v.*

MICHIGAN BUREAU OF SERVICES FOR BLIND PERSONS;
EDWARD ROGERS, II; TAMELA MEEK; JAMES HULL;
UNITED STATES DEPARTMENT OF EDUCATION; JOHN
KING, JR., Secretary of Education,

       *Defendants-Appellees*.

> No. 19-2179

─────────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 1:16-cv-00345; 1:16-cv-01169—Janet T. Neff, District Judge.

Argued: July 29, 2020

Decided and Filed: August 7, 2020

Before: SUTTON, COOK, and MURPHY, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:** W. Dane Carey, DINGEMAN & DANCER, PLC, Traverse City, Michigan, for Appellant. Christopher W. Braverman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State of Michigan Appellees. **ON BRIEF:** W. Dane Carey, DINGEMAN & DANCER, PLC, Traverse City, Michigan, for Appellant. Christopher W. Braverman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for State of Michigan Appellees.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.   The Randolph-Sheppard Act, found at 20 U.S.C. §§ 107 to 107f, requires government agencies to set aside certain contracts for sight-challenged vendors. Although the law applies primarily to federal agencies, States take the lead in licensing the vendors and matching them with available contracts.   In 2010, the State of Michigan denied Sheila Armstrong's bid for a contract to stock vending machines at highway rest stops in the State.   Convinced that the denial stemmed from a record-keeping error, Armstrong complained. After pursuing relief in state administrative proceedings, federal arbitration, and most recently the district court, she remains dissatisfied with the results.

Her appeal prompts two questions:   Was the unfavorable arbitration decision arbitrary or capricious under the Administrative Procedure Act?   And may Armstrong sue under 42 U.S.C. § 1983 to vindicate her rights under the Randolph-Sheppard Act?   Because the answer to both questions is no, we affirm.

I.

Sheila Armstrong earns her living as a licensed vendor with Michigan's Business Enterprise Program.   The program facilitates efforts by blind vendors to obtain contracts set aside for them under the Randolph-Sheppard Act and related federal and state laws.   20 U.S.C. § 107(b); Mich. Comp. Laws §§ 393.359, 393.363.   Passed in 1936, the Act requires federal agencies to give "blind persons licensed by a State agency" priority to operate vending carts, snack bars, and cafeterias on federal property, such as prisons, post offices, and the like. 20 U.S.C. §§ 107(b), 107e.   Since 1983, Congress has required the States to prefer blind vendors for contracts to stock vending machines at rest stops along the Nation's interstate highways as a condition of receiving certain federal transportation funds.   *See* Highway Improvement Act of 1982, § 111, Pub. L. No. 97-424, 96 Stat. 2097, 2106 (1983) (codified as amended at 23 U.S.C. § 111(c)).

In implementing this federal-state program, Michigan licenses vendors and connects them with available contracts, supplementing these federal set-asides with its own preferences for blind citizens under state law. *See* Mich. Comp. Laws § 393.359. The U.S. Department of Education plays a supporting role, issuing regulations that federal agencies and participating States must follow and overseeing arbitrations to resolve any disputes. *See generally Tenn. Dep't of Hum. Servs. v. U.S. Dep't of Educ.*, 979 F.2d 1162, 1163–65 (6th Cir. 1992).

In 2010, the Business Enterprise Program denied Armstrong's bid for a contract to stock vending machines at rest stops along Interstate 75 near Grayling, a town in Northern Michigan, more precisely in the northern part of the lower peninsula of Michigan. Armstrong claims that she lost the bid because officials miscalculated her "operator points," a comparison data point for competing bidders. R. 1 at 4–5. She filed a grievance with the Michigan agency that oversaw the bidding. A state administrative law judge ruled in Armstrong's favor in 2011 and recommended that she get "priority for the next available facility/location." R. 1-2 at 19–20. The State adopted the ALJ's recommendation and awarded Armstrong an available vending route later that year.

Armstrong nonetheless requested federal arbitration. *See* 20 U.S.C. §§ 107d-1(a), 107d-2. She asked to "be made whole" by immediately obtaining the vending contract she "rightfully should have" received and for nearly $250,000 in damages to account for delays in getting the license. R. 24-1 at 11–12. After a hearing on September 30, 2015, the arbitrators ruled that Armstrong "was wrongfully denied the [vending] location she sought," R. 1-4 at 9–10, and agreed that "the only way to make [her] whole is to grant [her] specific relief," *id.* at 10. They ordered Michigan to "immediately" assign Armstrong the Grayling vending route. *Id.* The arbitrators declined to award damages, reasoning that her request lacked sufficient evidence and was "too speculative." *Id.*

The decision did not satisfy anyone. Both sides sued in federal district court, challenging different parts of the arbitrators' decision. *See* 20 U.S.C. § 107d-2(a); *see also* 5 U.S.C. § 706(2). Armstrong asked the court to set aside the denial of her damages claim; Michigan objected to the order to award her the disputed contract. Armstrong also sued three Michigan officials, individually and in their official capacities, under 42 U.S.C. § 1983. She asked the

district court for an injunction enforcing the portion of the decision in her favor and for damages to account for lost profits due to the State's noncompliance with the arbitrators' order.

The district court upheld the arbitration award in full. And it rejected Armstrong's § 1983 claims, concluding that the Randolph-Sheppard Act created the sole statutory right to relief under federal law. After the court issued its decision, Michigan granted her the Grayling license. All that remains in the case is Armstrong's request for money damages under the Randolph-Sheppard Act and § 1983. We address each in turn.

## II.

When a plaintiff asks a State for money damages premised on an alleged violation of a federal statute, questions about sovereign immunity often follow. There's the question of power: Has Congress invoked a permissible basis for abrogating the State's immunity from suit? *Sossamon v. Texas*, 563 U.S. 277, 281, 284 (2011). And there's the question of clarity: Even if Congress has the requisite authority, say under its spending power, did the legislature "unequivocal[ly] express[]" its intent to expose States to liability? *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).

Both questions linger in this case. But we need not resolve them today. When a State "declines to raise sovereign immunity as a threshold defense," we have the "discretion to address the sovereign-immunity defense and the merits in whichever order [we] prefer." *Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 477 (6th Cir. 2006). Whether in the district court or here, the State has not shown any preference for resolving the immunity-related questions at the outset. We therefore rely on more straightforward grounds for resolving this appeal.

## III.

Federal courts review the outcome of an arbitration under the Randolph-Sheppard Act the same as they would a "final agency action" under the APA. 20 U.S.C. § 107d-2(a). That means we may "set aside" a panel's decision when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706(2)(A). Judicial review of an agency

action, we have emphasized, "is not an invitation for judicial second-guessing." *Ky. Coal Ass'n v. Tenn. Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015). So long as we can "reasonably" "discern[]" from the decision-making process why the arbitrators did what they did, and so long as they considered all the relevant evidence and "articulate[d] a satisfactory explanation" for their decision, we will not set aside the decision. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quotations omitted).

The arbitration decision satisfies this standard. In rejecting her request for nearly $250,000 in damages, the arbitrators reasoned that this amount was "too speculative," as her unrealized earnings "cannot be determined with any accuracy, given the number of variables involved." R. 19-3 at 73. In particular, the panel noted that she had operated "another facility during the intervening years," and the record did not disclose the difference between what she made in that facility and what she would have made in the Grayling facility. *Id.* This explanation confirms that the arbitrators did not "entirely fail[] to consider an important aspect of the problem, offer[] an explanation for [their] decision that r[a]n counter to the evidence before [them]," or arrive at a conclusion "so implausible" that a difference of opinion cannot explain it. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Armstrong complains that the decision not to award damages contradicts the arbitrators' finding that "no other location is comparable" to the Grayling vending route. R. 19-3 at 73. "How could [the panel] make th[is] finding[]," she asks, "without having the ability to identify lost income?" Appellant Br. 28. But it's reasonable to acknowledge that one enterprise may be more profitable than another without being able to say by how much. This decision does not "run[] counter to the evidence." *State Farm*, 463 U.S. at 43.

Armstrong insists that the arbitrators failed to appreciate that "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness." *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) (quotation omitted). That may be true. But in her opening brief on appeal, she did not point to reliable evidence in the record about what she would have made in the other facility. All she cites is a two-page account of her dispute with the State that includes one sentence about what the other operator, name unknown, made at some point at the Grayling facility. No account is given of how she got the information or what year it

covers.  The arbitrators' conclusion that Armstrong's claim should be denied because "what she would have earned as operator of [the Grayling vending route] cannot be determined with any accuracy, given the number of variables involved" is not arbitrary on this record.  R. 19-3 at 73.

In her *reply* brief, she says that the arbitrators erred in denying her a chance to introduce evidence of damages.  That is too little too late.  At any rate, she had plenty of opportunities to introduce evidence of damages, and even on appeal she still does not point to reliable evidence of earnings from the other facility.  The decision was not arbitrary or for that matter capricious.

IV.

That leaves Armstrong's claim under § 1983, which runs into a different merits problem.  The statute does not authorize her to obtain damages that the Randolph-Sheppard Act itself does not authorize or that she failed to obtain under it.

Since *Maine v. Thiboutot*, 448 U.S. 1 (1980), the Supreme Court has allowed plaintiffs to invoke § 1983's right of action in some discrete settings.  But § 1983 "does not provide an avenue for relief every time a state actor violates a federal law."  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005).  To enforce another federal statute under § 1983, a claimant must do two things.  First, she must show that Congress "unambiguously" granted her an individually enforceable "right" under the separate federal statute.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002).  Vague references to "benefits" or "interests" do not suffice.  *Id.* at 283.  Second, she must show that Congress's creation of a right of action in the underlying statute does not occupy the field.  "The provision of an express, private means of redress in the statute itself," the Supreme Court has explained, "is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."  *Rancho Palos Verdes*, 544 U.S. at 121; *see also Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 904 (6th Cir. 2014).

We need not resolve whether the Randolph-Sheppard Act creates the kind of rights that § 1983 may enforce.  The salient problem with this request is that the Act creates precisely the sort of "comprehensive enforcement scheme" that an individual remedy under § 1983 would frustrate.  *See Blessing v. Freestone*, 520 U.S. 329, 341 (1997).

The Act requires vendors and States to resolve their disputes through a carefully designed set of procedures that give state officials—not federal authorities, much less the federal courts—the first shot at resolution.  Under the Act, vendors initially must seek relief through a state administrative process.  *See* 20 U.S.C. §§ 107d-1(a), 107d-2; *Fillinger v. Cleveland Soc'y for the Blind*, 587 F.2d 336, 337–38 (6th Cir. 1978).  After that, they may seek federal arbitration.  Only after that may they seek relief in federal court.  Even then, the Act confines judicial review to the narrow grounds permitted under § 706 of the APA.  *See* 20 U.S.C. § 107d-2(a).  It's "hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies" that minimize, rather than exalt, the federal judiciary's role.  *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981); *see also Smith v. Robinson*, 468 U.S. 992, 1010–12 (1984).

Armstrong objects that, in the absence of "an alternative judicial enforcement mechanism" under the Randolph-Sheppard Act, she may invoke § 1983.  Appellant Br. 19–21.  But the Act does contain a federal judicial enforcement mechanism.  It just comes at the end, not the beginning, of the dispute.  The Supreme Court has never held that there must be an alternative private right of action at the outset of the dispute to preclude recognizing a § 1983 action as a way to enforce the law.  Much to the contrary, *City of Rancho Palos Verdes v. Abrams* tells us to look at judicial *and* administrative remedies as part of the assessment of a statute's remedial scheme in determining whether Congress meant to allow relief under § 1983 as well.  544 U.S. at 121–22; *see, e.g.*, *Blessing*, 520 U.S. at 348 (observing that "Title IV-D contains no private remedy—either judicial or administrative"); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 521–22 (1990) (similar for Medicaid Act).  "[T]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *City of Rancho Palos Verdes*, 544 U.S. at 121 (quotation omitted).

*Smith v. Robinson*, 468 U.S. 992 (1984), undermines rather than advances Armstrong's claim.  It concluded that the Education of the Handicapped Act, which guarantees an adequate education to disabled children, prevents parents from pressing constitutional claims under § 1983 for the same conduct.  *Id.* at 1010–12.  The Court emphasized that a § 1983 lawsuit would allow plaintiffs to "circumvent the [statute's] administrative remedies."  *Id.* at 1012.  While the statute

permits parents to "bring a civil action" against local officials in some settings, *see, e.g.*, 20 U.S.C. § 1415(i)(2), the remedial scheme features state and local administrative hearings as the leading fora for resolving disputes. *Smith*, 468 U.S. at 1011–12. So too with the Randolph-Sheppard Act. In both cases, Congress decided that disputes should be "worked out through a process that begins on the local level and includes ongoing [consultation], detailed procedural safeguards, and a right to judicial review" in the end. *Id.* at 1011.

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), and *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017), do not help Armstrong either. They merely recognized § 1983 lawsuits to enforce *constitutional* rights. But there's nothing wrong with "divergent coverage" between statutory and constitutional protections. *Fitzgerald*, 555 U.S. at 258. That happens all the time, and it simply does not implicate the problem presented here: deploying § 1983 to marginalize, if not overrun, the enforcement mechanisms already provided in considerable detail in another federal statute. If Armstrong thinks vendors should have more remedies from States than they already have under the Randolph-Sheppard Act, the proper approach is to obtain an amendment to the Act, not to make it irrelevant by using § 1983 instead.

We affirm.